## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANIBELKA HENRIQUEZ SQUIRES,     ) | |
|                     ) | |
|          Plaintiff,     ) | |
|                     ) | |
|       v.                   ) | Civil Action No. 20-1348 (ABJ) |
|                     ) | |
| GALLAUDET UNIVERSITY,     ) | |
|                     ) | |
|          Defendant.     ) | |
| | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Anibelka Henriquez Squires has filed a twelve-count complaint against her former employer, Gallaudet University, arising out of her employment as an Academic-Career Advisor from 2016 to 2018. Plaintiff, who is Latina and hard-of-hearing, has brought claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, the Family Medical Leave Act of 1993, the D.C. Human Rights Act, and the D.C. Accrued Safe and Sick Leave Act, alleging that she was subjected to race and disability discrimination, retaliation, a hostile work environment, and interference with her statutory rights.

Defendant filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), which is fully briefed. Upon consideration of the parties' arguments and the entire record herein, the Court will grant defendant's motion to dismiss all of plaintiff's claims, except her claim under the D.C. Accrued Safe and Sick Leave Act. Because all the federal claims will be dismissed, the Court declines to exercise jurisdiction over the D.C. Accrued Safe and Sick Leave Act.

## BACKGROUND

Plaintiff is a Latina woman and a member of the deaf community who has worked for defendant Gallaudet in various positions since October 2002, including in its Department of Public Safety, as the Lead Teacher through Gallaudet at Kendall Demonstration Elementary, as well as a Senior Admissions Counselor.  *See* 2d Am. Compl. [Dkt. #1-1] ("Compl.") ¶¶ 8–9.[1]

In November 2016, plaintiff was elected as Gallaudet Staff Council Chair ("GSC"), a volunteer position in which she worked closely with the university president to represent staff campus-wide.  Compl. ¶ 11.  She held the GSC position from January 2017 to June 2018.  *Id.*

On November 21, 2016, plaintiff was transferred to defendant's Academic Advising Department to work as an Academic-Career Advisor under the supervision of Kathleen O'Brien. Compl. ¶¶ 10, 14.  There, she complains, she "was immediately responsible for a caseload of 'red-flagged' advisees, indicating the students had poor attendance, were unresponsive, and required ongoing follow-ups."  *Id.* ¶ 16.  She received these advisees at the direction of O'Brien, who asked each advisor to identify at least thirty to thirty-five red-flagged advisees for assignment to plaintiff. *Id.* ¶ 17.

Plaintiff was the only hard-of-hearing and Latina advisor working in the Academic Advising Department.  *Id.* ¶ 13.  Plaintiff explains in her complaint that she "is considered medically 'deaf' by sound detection ability, but with an assisted device such as a hearing aid, she

---

1    The second amended complaint appears in Exhibit A to the Notice of Removal [Dkt. # 1], from pages 66–95 of the PDF document.  For ease of reference, the Court will refer to the second amended complaint as simply "the complaint" and will refer to paragraphs in the complaint when citing to it.  When citing to other documents in the exhibit attached to the Notice of Removal, the Court will refer to the PDF page numbers appearing at the top of the document in the court's electronic filing stamp.

is considered 'hard-of-hearing,'" and she did not require an interpreter for many one-on-one advising meetings with hearing parents.  *Id.*  None of the other advisors, including her supervisor, had the auditory or articulation ability that plaintiff did, and they were considered medically deaf. *Id.* ¶¶ 14–15.  This differentiation – the fact that plaintiff had abilities that others at the school for the deaf and hard-of-hearing lacked – is the basis for plaintiff's claims that she was discriminated against on the basis of a disability.

## I.    August 2017 Request to Attend Social Justice Conference as GSC

The complaint suggests that plaintiff and her supervisor got off to a rocky start and never recovered.  On August 4, 2017, plaintiff received an invitation through the GSC to attend and co-present at a social justice conference out-of-state, and she asked O'Brien for leave from the Academic Advising Department to attend.  Compl. ¶ 18.  As plaintiff puts it, O'Brien denied the request "ostensibly because it fell within the [department's] 'black-out' dates for course registration, during which Advisors could not take time off."  *Id.* ¶ 19.  After her supervisor denied the request, plaintiff emailed the university president on August 15, 2017.  *Id.* ¶ 21.  The President, Associate Provost, Associate Dean of Academic and Career Success, and plaintiff's supervisor reconsidered the decision, and on August 18, they approved the request to take leave to attend the conference.  *Id.* ¶ 22.

Plaintiff includes the initial denial of the request in her list of grievances even though it was reversed.  She alleges that other advisors "including Jessica Duhon, were given opportunities to participate in events, such as attendance at the Admissions Review Committee, whereas Plaintiff was denied the opportunity to go to the social justice conference, and other events, including the Open House booth from Admissions, the Admissions Review Committee, Latinos in DC Conference, and an Academic Advisors conference in Delaware."  *Id.* ¶ 20.  The complaint does

not specify whether the other events took place during black-out dates or whether other advisors were granted or denied permission to attend any of the events she mentioned other than the Admissions Review Committee.  *See id.*

## II.    November 2017 First Performance Evaluation

On November 14, 2017, plaintiff met with her supervisor and EEO Director Sharrell McCaskill for her first performance review as an Academic-Career Advisor, for the period of November 21, 2016 to September 30, 2017.  Compl. ¶ 23.  Under the section of the review concerning "interpersonal skills and commitment," her supervisor indicated that plaintiff's attitude "needs improvement."  *Id.* ¶ 24.  According to the complaint, plaintiff had never previously received that comment in any performance evaluation review throughout her tenure at the university.  *Id.* ¶ 25.  When plaintiff asked for examples of when she displayed an undesirable attitude, her supervisor cited the appeal to the university president regarding the social justice conference but could not identify any others. *Id.* ¶ 26.  Neither plaintiff's overall evaluation score for that performance review nor a copy of the evaluation itself has been provided to the Court, so the effect of the "needs improvement" assessment in this one category on plaintiff's evaluation is unclear.

On December 4, 2017, plaintiff appealed her performance evaluation.  Compl. ¶ 27.  The complaint does not state the outcome of that appeal.  *See id.*  Throughout December 2017, she exchanged letters with her supervisor, who then recounted other interactions in which plaintiff had displayed a negative attitude.  *Id.* ¶ 28.  In response, plaintiff asserted that those exchanges were being misconstrued.  *Id.*

### III.    January 2018 Reprimand Letters

On January 18, 2018, plaintiff received her first letter of reprimand.  Compl. ¶ 31.  She states that it was "for non-compliance . . . for leaving the room of a welcome lunch, despite having only left the room for 10 minutes to take a short break."  *Id.* ¶¶ 30–31.  On January 22, 2018, she received an addendum to the January 18 reprimand letter based on an incident when, as plaintiff describes it, "a walk-in advisee came at 4:15 p.m., though Plaintiff stopped seeing advisees at 4:00 p.m., to use the restroom and go to a university council meeting, as Plaintiff had not received a lunch break that day."  *Id.* ¶ 32.  Plaintiff alleges that "[a]nother advisor, Jessica Duhon, stopped seeing advisees at 4:00 p.m. the following day" and that other colleagues were not questioned when they stopped work around 4:15 p.m., used the restroom, or left a few minutes early.  *Id.* ¶¶ 32–33.

The complaint alleges that "plaintiff was repeatedly informally reprimanded for arriving late and/or leaving early within five minutes of her arrival/departure time/return from lunch break," and she felt as if her supervisor was constantly monitoring her movements.  Compl. ¶ 34.  She rarely took lunch breaks outside of the office, and when she did, she says, she would return within thirty minutes, while her colleagues, including Jessica Duhon, would return ten to fifteen minutes late without being reprimanded.  *Id.* ¶¶ 35–36.

On January 22, 2018, plaintiff received another reprimand, accusing her of abusing or misusing the sick leave policy during black-out dates and stating that her monthly use of sick leave was a cause for concern.  Compl. ¶ 37.  This "sick-leave reprimand came despite the [department's] knowledge that Plaintiff routinely took sick leave twice a month."  *Id.* ¶ 38.  As a result of this reprimand, plaintiff was required to submit a doctor's note every time she took sick leave, even though the department's policy required a note only if an employee took more than three

consecutive sick days.  *Id.* ¶ 39.  Plaintiff had never taken more than two days off in a row, but she alleges that other advisors, including Jessica Duhon, "were out of the office as often or more often than Plaintiff" but were not accused of abusing the sick leave policy or required to submit doctors' notes for every absence.  *Id.* ¶¶ 40–41.

On January 22, 2018, plaintiff emailed EEO Director McCaskill and Associate Dean for Academic and Career Success Thelma Schroeder to express concerns for her safety around O'Brien and to address the reprimand letters.  Compl. ¶¶ 22, 42.  The complaint does not indicate whether plaintiff received a response to the email.  *See id.* ¶ 42.

## IV.   FMLA Leave January 23, 2018–March 18, 2018 and Return

Following three reprimands in one week and her supervisor's "ongoing hostility," plaintiff saw her doctor on January 23, 2018 for "sleep disturbance, anxiety, and lack of appetite," and was subsequently granted Family and Medical Leave Act ("FMLA") leave from January 23 to March 18, 2018.  Compl. ¶¶ 43–44.  While on leave, plaintiff appealed the January 18 reprimand, the January 22 addendum, and the January 22 reprimand.  *Id.* ¶ 45.  The complaint does not state the outcome of those challenges.  *See id.*

Plaintiff alleges that after she returned to work on March 19, 2018, her supervisor continued her "retaliatory conduct" and the "hostile work environment persisted."  Compl. ¶¶ 46–47.  "On a regular basis, . . . Ms. O'Brien stopped in front of Plaintiff's office, made large gestures, flashed Plaintiff's door light and jumped to get Plaintiff's attention," and when plaintiff made eye contact, "O'Brien would smirk and walk away."  *Id.* ¶ 47.

In or around May 2018, the Academic Advising Department began holding bi-weekly meetings between supervisors and advisors, and plaintiff met with her supervisor in the supervisor's office on May 22, 2018.  Compl. ¶ 48.  At this first meeting, plaintiff said that she

was uncomfortable meeting in O'Brien's office and asked to hold future meetings in a neutral space, but O'Brien said the meeting location would not change. *Id.* ¶ 49. When plaintiff reiterated at the next meeting on June 12, 2018 that she wanted to meet in a neutral area and have a representative from Human Resources ("HR"), Equal Employment Opportunity ("EEO") office, or the Office of the Ombuds ("OMBUDS") present, O'Brien responded that a third party was not necessary. *Id.* ¶ 50.

## V.     October 2018 Termination

On June 14, 2018, plaintiff received another reprimand letter from O'Brien "concerning negative behavior and insubordination, in part based on Plaintiff's not greeting Ms. O'Brien and displaying discomfort in the bi-weekly meetings." Compl. ¶ 51. Plaintiff appealed the reprimand, emphasizing that "O'Brien's continued harassment resulted in Plaintiff's experiencing negative effects, including anxiety, withdrawal, sleep disturbance, avoidance of eye contact, depression, and confusion." Compl. ¶ 52. The complaint does not include the result of that appeal either. *See id.*

Plaintiff alleges that O'Brien "continued to make an issue out of trivial disagreements or office conduct," such as failing to copy her on an email that plaintiff had only intended to send to another advisor. Compl. ¶ 53. She also complains that throughout June 2018, Associate Dean Schroeder, who was a friend of O'Brien's, "began pacing back and forth by Plaintiff's office, giving her long stares." *Id.* ¶ 54.

Later that summer, on August 17, 2018, defendant presented the plaintiff with a document entitled "Confidential Settlement Agreement and Mutual Release," which "included the condition that Plaintiff resign that same day." Compl. ¶ 55. Plaintiff rejected the offer on August 23, 2018. *Id.* ¶ 56. That same day, "[d]efendant gave Plaintiff's then-attorney the option by e-mail for

Plaintiff to return to the [Academic Advising Department]," but when plaintiff "attempted to accept the offer on August 24, 2018, Plaintiff was then told she could not return." *Id.* ¶¶ 56–58.

Plaintiff received a letter dated October 2, 2018, "terminating [her] employment with the reason provided that she declined to accept Defendant's proposed settlement agreement." Compl. ¶ 59.

## PROCEDURAL HISTORY

On June 27, 2019, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC").[2]  Compl. ¶ 145; Ex. A to Def.'s Mot. [Dkt. # 3-2] ("EEOC Complaint").[3] On August 20, 2019, the U.S. Equal Employment Opportunity Commission issued a notice of right to sue.  Compl. ¶ 7.

On September 30, 2019, plaintiff filed a pro se lawsuit in the Superior Court for the District of Columbia, alleging that defendant violated her rights under the D.C. Human Rights Act on the basis of her race and her disability, and that it had subjected her to a hostile work environment.

---

2      Plaintiff alleges three different dates for when she filed her complaint with the EEOC: July 27, 2018, Compl. ¶ 63; June 27, 2019, *id.*  ¶ 145; and June 26, 2019.  *Id.* ¶ 7.  The motion to dismiss points out this discrepancy, Def.'s Mot. at 21 n.4, and attaches the EEOC filing with plaintiff's signature dated June 27, 2019.  *See* EEOC Complaint.  Plaintiff's opposition brief does not dispute the veracity of the attachment, *see* Pl.'s Mem. of P. & A. in Opp. [Dkt. # 4] ("Pl.'s Opp."), indicating that the 2018 and June 26, 2019 dates were erroneous.

3      The EEOC filing is referenced in the complaint and thereby incorporated by reference, *Felder v. Johanns*, 595 F. Supp. 2d 46, 58–59 (D.D.C. 2009), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  Consideration of this document is proper because, when presented with a motion to dismiss, a court may consider "any documents attached to [the non-movant's pleadings] or incorporated by reference."  *Id.* at 60.  Further, a court may consider an EEOC complaint "without converting a motion to dismiss into a motion for summary judgment because such records are public documents of which a court may take judicial notice."  *Ndondji v. InterPark Inc.*, 768 F.Supp.2d 263, 272 (D.D.C. 2011) (internal quotation marks omitted).

Original Complaint, Ex. A to Notice of Removal [Dkt. # 1-1] at PDF 2–4. She sought "all remedies available" under D.C. law. *Id.* at 3. Defendant moved to dismiss, plaintiff filed an amended complaint, which defendant moved to strike, and the D.C. Superior Court continued the matter to allow plaintiff to obtain counsel. Notice of Removal [Dkt. # 1] ¶¶ 2–5.[4]

On April 29, 2020, after retaining counsel, plaintiff was granted leave to file a second amended complaint, and the motions to dismiss and to strike were deemed to be moot. *See* Ex. A to Notice of Removal [Dkt. # 1-1] at PDF 97–98 (orders of D.C. Superior Court).

On May 20, 2020, defendant removed the matter to this court, Notice of Removal [Dkt. # 1], and on May 21, 2020, it filed a motion to dismiss the second amended complaint for failure to state a claim. Def.'s Mot. Plaintiff opposed the motion, Pl.'s Opp., and defendant has filed a reply. Def.'s Reply to Pl.'s Opp. [Dkt. # 6] ("Def.'s Reply").

### STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679, citing *Twombly*, 550 U.S. at 556.

---

4       *See also* Ex. A to Notice of Removal [Dkt. # 1-1] at PDF 23–32 (motion to dismiss); *id.* at PDF 33–39 (amended complaint); *id.* at PDF 40–44 (motion to strike); *id.* at PDF 51 (order continuing matter).

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). Therefore, when considering a motion to dismiss, a court must construe a complaint liberally in the plaintiff's favor. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept plaintiff's legal conclusions. *Id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

**ANALYSIS**

The complaint consists of twelve counts brought under a number of federal and District of Columbia statues.

- Count I – Retaliation (Adverse Actions, Protected Activity Deterrents and Termination) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII")

- Count II - Hostile Work Environment (Adverse Actions and Protected Activity Deterrents) under Title VII

- Count III - Wrongful Termination under Title VII

- Count IV - Race Discrimination (Disparate Treatment) under Title VII

- Count V - Disability Discrimination (Disparate Treatment) under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq.* ("ADA")

- Count VI - Hostile Work Environment (Adverse Actions and Protected Activity Deterrents) under the ADA

- Count VII - Retaliation (Adverse Actions and Protected Activity Deterrents and Termination) under the ADA

- Count VIII - Retaliation under the Family Medical Leave Act of 1993, as amended 29 U.S.C. § 2601, *et seq.* ("FMLA")

- Count IX - Race Discrimination under the District of Columbia Human Rights Act D.C. Code § 2-1401.01, *et seq.* ("DCHRA")

- Count X - Retaliation under the DCHRA

- Count XI - Hostile Work Environment (Adverse Actions and Protected Activity Deterrents) under the DCHRA

- Count XII - (Interference) under the District of Columbia Accrued Safe and Sick Leave Act D.C. Code § 32-531.01, *et seq.*

**I.    Plaintiff fails to allege sufficient facts to support her claims of a discriminatory hostile work environment, so Counts II, XI, and VI will be dismissed.**

Plaintiff alleges that she was subjected to a hostile work environment on the basis of her race in violation of both Title VII (Count II) and the DCHRA (Count XI) and on the basis of her

disability in violation of the ADA (Count VI).  "To prevail on a hostile work environment claim, a plaintiff must first show that he or she was subjected to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013), quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993) (Title VII case); *see Daka, Inc. v. Breiner*, 711 A.2d 86, 92 (D.C. 1998) (holding that the same legal standard for hostile work environment applies in Title VII and DCHRA claims); *Floyd v. Lee*, 85 F. Supp. 3d 482, 516–17 (D.D.C. 2015) (explaining that courts have held that a hostile work environment claim is cognizable under the ADA because the Supreme Court has held that similar language in Title VII establishes a cause of action for hostile work environment harassment; applying the same legal standard).

To determine whether a work environment is actionable, courts examine all circumstances, which may include frequency of discriminatory conduct, its severity, whether it is physically threatening or humiliating, or merely offensive, and whether it unreasonably interferes with employee's work performance; effect on employee's psychological well-being is relevant in determining whether victim actually found environment abusive, but that factor, like any other relevant factor, may be taken into account and no single factor is required.  *Harris*, 510 U.S. at 23.

It is not enough for plaintiff to merely state that she was discriminated against on the basis of race or disability – she must allege that the conduct constituted discrimination on the basis of the protected trait.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (finding no hostile work environment because none of the comments or actions directed at the plaintiff were on the basis of the plaintiff being a member of a protected class); *Stewart v. Evans,* 275 F.3d 1126, 1133 (D.C.

Cir. 2002) (discrimination laws do not prohibit all forms of workplace harassment, only harassment based on a person's protected status).  Following that guidance, courts in this district have observed that "some linkage between the hostile behavior and the plaintiff's membership in a protected class" is required.  *Na'im v. Clinton,* 626 F.Supp.2d 63, 73 (D.D.C. 2009); *Bryant v. Brownlee,* 265 F. Supp. 2d 52, 63 (D.D.C. 2003) ("It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals."), quoting *Alfano v. Costello,* 294 F.3d 365, 377 (2d Cir. 2002).

Further, a hostile work environment claim has both a subjective and an objective component:  plaintiff must allege facts showing that she subjectively perceived the environment as hostile and that the environment is one "that a reasonable person would find hostile or abusive."  *Harris*, 510 U.S. at 21–22.  The objective element "prevents Title VII from expanding into a general civility code," and thus, the crucial requirement for a hostile work environment claim is that the behavior complained of is "so objectively offensive as to alter the 'conditions' of the victim's employment."  *Oncale,* 523 U.S. at 81.  Whether the objective standard has been met is considered based on the "totality of the circumstances."  *Baloch*, 550 F.3d at 1201; *see also Allen v. Napolitano*, 774 F. Supp. 2d 186, 205–06 (D.D.C. 2011), citing *Holbrook v. Reno*, 196 F.3d 255, 262–63 (D.C. Cir. 1999) (explaining that a defendant's behavior must severely or pervasively alter and interfere with plaintiff's employment); *see also Ayissi-Etoh,* 712 F.3d at 577.

Plaintiff lists a number of circumstances in support of her hostile work environment claims: she was assigned the more  challenging "red-flagged" advisees upon her arrival in the department; she was denied several opportunities to participate in outside events on work days; she received multiple reprimands and was subjected to ongoing micromanagement; she received what she

characterizes as a negative job performance review in 2017 – the "needs improvement" in the "attitude" category; and she was otherwise harassed by her supervisor and an associate dean. Compl. ¶ 74 (Count II – Title VII); *id.* ¶ 127 (Count VI – ADA); *id.* ¶ 188 (Count XI – DCHRA). But notwithstanding the pettiness of some of the alleged behavior and the supervisor's questionable management style, these allegations, taken as true, do not paint a picture of "discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Baloch*, 550 F.3d at 1201*; see also Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88 (1998). The first problem is that most of the allegations describe ordinary workplace management disputes that do not add up to a severe disruption of plaintiff's working conditions. But the larger problem is that even if together, they suggest that plaintiff's supervisor displayed ongoing ill-will towards her, and that a reasonable employee would find her behavior to be abusive, a hostile work environment is not actionable unless is it permeated by *discriminatory* animus; a showing of generalized hostility is not enough. *Stewart*, 275 F.3d at 1133. And therefore, while some of the alleged incidents were unquestionably demeaning, and the Court can well understand why plaintiff found the situation intolerable, there are no facts alleged that support an inference that plaintiff was forced to endure offensive insult or ridicule that had any connection to her race or to the fact that she was hard-of-hearing and not medically deaf.

For example, with respect to the severity of the allegations, plaintiff alleges no facts indicating that the caseload of advisees she received when she joined the department included a disproportionate share of red-flagged students. *See* Compl. ¶¶ 16–17. Her assertion that she was "denied" the opportunity to attend the social justice conference is directly contradicted by her own allegation that she was subsequently allowed to attend. *Id.* ¶¶ 18–20, 22. And her complaints

about reprimands, micromanagement, and a single "needs improvement" assessment on just one aspect of one performance review, Compl. ¶¶ 23–36, 74, 127, 188, fall well within the category of "ordinary tribulations of the workplace." *Faragher,* 524 U.S. at 788; *see also Baloch*, 550 F.3d at 1201.

The allegations that the supervisor, who was deaf herself, switched lights on and off and made large gestures to get plaintiff's attention, only to smirk and walk away, or that an associate dean paced nearby and stared at her describe understandably annoying events. Compl. ¶¶ 156, 158. It was also clearly frustrating to plaintiff that she was required to attend meetings in her supervisor's office instead of in the neutral location she requested. *Id.* ¶ 50. But there are no facts in the complaint that any of this could be reasonably characterized as physically threatening. Plaintiff alleges that her supervisor's "ongoing hostility" caused her to take medical leave, Compl. ¶¶ 43–44, thereby interfering with her work. But even if she has identified events that were in fact humiliating or oppressive to her, the complaint does not recount any statements that were offensive on their face or made reference to her race or her particular disability, and it is devoid of any facts that would support a plausible inference that any hostility or harassment she encountered was because of either. And that is what is needed to make even a truly oppressive environment an illegal one. *Harris*, 510 U.S. at 23.

The complaint simply asserts that plaintiff was the only Latina advisor in the department and the only hard-of-hearing advisor when all the others were medically deaf. *See* Compl. ¶¶ 13–14, 105. The Court finds that these allegations, standing alone, do not suffice to transform the complaints about burdensome assignments and an unpleasant supervisor into a claim for hostile work environment; any suggestion that there was something discriminatory about the situation is entirely conclusory. *See Oncale*, 523 U.S. at 81; *Baloch*, 550 F.3d at 1201. While supervisors

may be harsh, unfair, and rude, that alone will not necessarily establish a violation of discrimination laws.

Therefore, the Court will dismiss Counts II, VI, and XI.

## II.   Counts I, VII, VIII, and X claiming retaliation under Title VII, the FMLA, the ADA, and the DCHRA will be dismissed.

Plaintiff next alleges that defendant retaliated against her in violation of Title VII (Count I), the ADA (Count VII), the FMLA (Count VIII), and the DCHRA (Count X), each of which make it unlawful to retaliate against an individual for undertaking activity protected by that particular statute.  *See* 42 U.S.C. § 2000e–3(a) (Title VII); 2 U.S.C. § 1317(a) (ADA); 29 U.S.C. § 2615(a)(2); (FMLA); D.C. Code § 2–1402.61 (DCHRA).  To demonstrate retaliation, plaintiff must show that 1) she engaged in protected activity, 2) she was subjected to an adverse employment action, and 3) there was a causal link between the protected activity and the adverse action. *Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015) (Title VII); *Woodruff v. Peters*, 482 F.3d 521, 528–29 (D.C. Cir. 2007) (ADA); *Gleklen v. Democratic Cong. Campaign Comm., Inc.,* 199 F.3d 1365, 1367–68 (D.C. Cir. 2000) (FMLA and DCHRA); *Waggel v. George Washington Univ.,* 957 F.3d 1364, 1375 (D.C. Cir. 2020) (FLMA).

Adverse employment actions in the retaliation context need only "be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  "The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."  *Id.* at 67 (2006); *see also Bridgeforth v. Jewell*, 721 F.3d 661, 663 n.* (D.C. Cir. 2013) (explaining that retaliation "encompass[es] a broader sweep of actions" than wrongful discrimination).  But to be actionable, a workplace event must still have consequences;

"[w]e speak of *material* adversity because we believe it is important to separate significant from trivial harms.  Title VII, we have said, does not set forth 'a general civility code for the American workplace.'"  *Burlington N.,* 548 U.S. at 68 (emphasis in original), quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998).  The plaintiff still must suffer some objectively tangible harm.  *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007); *Forkkio v. Powell*, 306 F.3d 1127, 1130–32 (D.C. Cir. 2002) (explaining that purely subjective injuries, such as dissatisfaction with a reassignment, public humiliation, or loss of reputation are not adverse actions, while reassignment with significantly different responsibilities or a significant change in benefits generally indicates an adverse action; holding that the assignment of the plaintiff's supervisor "may have caused [plaintiff] subjective injury, but it did not objectively harm his working conditions or future employment prospects" to support a retaliation claim).

Furthermore, "[n]ot every complaint garners its author protection under Title VII.  While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition."  *Broderick v. Donaldson,* 437 F.3d 1226, 1232 (D.C. Cir. 2006) (internal citations omitted) (opining that a memorandum the plaintiff sent to her supervisors and the EEO office, by itself, may not have met this standard because it "did not allege . . . that she was currently being discriminated against or that she was being retaliated against for her previous lawsuit").

A.    **The Title VII and DCHRA retaliation claims fail because plaintiff failed to allege that she engaged in activity protected by the statutes.**

In Count I, plaintiff alleges that defendant retaliated against her for engaging in activity protected by Title VII, and in Count X, she makes the parallel claim under D.C. law:  that defendant retaliated her for engaging in activity protected by the DCHRA.  Both counts claim retaliation for

activity under those statutes to address discrimination against the plaintiff based on race, Compl. ¶¶ 64, 184, but both fail in the absence of any allegation that she in fact complained about racial discrimination prior to the challenged events.

Plaintiff repeatedly asserts that she complained to officials at the university, including HR, the EEO Officer, OMBUDS, and superiors, such as the Associate Dean and Associate Provost, about the mistreatment she suffered at the hands of her supervisor and others.  *See* Compl. ¶ 62 (alleging in Count I that she made "repeated complaints of Ms. O'Brien's harassment"); *id.* ¶ 180 (alleging in Count X that she "made numerous complaints to various bodies including repeated complaints of harassment and hostile work environment"); *see also id.* ¶¶ 79, 132, 144.

But she does not allege that any of her complaints or appeals to officials at Gallaudet asserted race discrimination, and she does not attach any of the emails, letters, or appeals to the complaint.  *See* Compl.; *id.* ¶¶ 27–28, 42, 45, 52.[5]  Plaintiff may have complained to the university about her supervisor's hostility, but the record contains no facts to support an inference that she ever raised concerns about race discrimination in doing so.  Therefore, there are no facts to support

_____

5      Indeed, the only document that appears in the record in this case that pre-dates plaintiff's termination is a letter dated February 28, 2018 attached to plaintiff's first amended complaint.  *See* Ex. A to Notice of Removal [Dkt. # 1-1], Am. Compl., at PDF 33–39.  The letter is from her then-attorney to defendant's Director, Human Resources Service, asserting violations of the D.C. Leave Act and the National Labor Relations Act.  Letter from Gregory P. Currey to Christina Shen-Austin (Feb. 28, 2018) at PDF 37–38 ("Feb. 28, 2018 Letter").  With the preface that plaintiff "believes that the actions set forth herein are isolated incidents related to one supervisor," the letter enumerates some of the same incidents set forth in the complaint before the Court.  *See id.* (complaining about "[h]er initial caseload" of red-flagged advisees and her supervisor's lack of support for her participation in the GSC, which led O'Brien to "restrict Ms. Henriquez Squires' participation in the GSC and enforce department policies and procedures related to the use of sick leave in violation of applicable law").  While it would have been significant for purposes of this motion if the record reflected that she specifically complained of race or disability discrimination to the school at that time, the only contemporaneous document to be found in the record makes no mention of either.

an inference that she engaged in protected activity before she was terminated or any of the other actions were taken against her.  *See Broderick,* 437 F.3d at 1232.

Plaintiff did engage in protected activity when she filed a charge of discrimination with the EEOC, but she did not file that charge until June 2019 – more than eight months after she was terminated.  Compl. ¶ 7; EEOC Complaint.  Because she filed her EEOC complaint well after the allegedly retaliatory events occurred, it cannot serve as the basis for her retaliation claims.  *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000), quoting *Mitchell v. Baldrige,* 759 F.2d 80, 85 n.3 (D.C. Cir. 1985) (stating that to establish a causal connection between a protected activity and an adverse employment action, plaintiff must allege that defendant knew about the protected activity "and that the adverse personnel action took place shortly *after* that activity") (emphasis added).  Here, *every* alleged action by defendant took place on or before October 2, 2018, when she was terminated, long before she filed her June 2019 EEOC complaint.  *See* Compl. ¶¶ 1–59; EEOC Complaint.  Thus, there can be no causal connection between the 2019 EEOC complaint and any of defendant's actions.

Given the absence of any allegation that plaintiff engaged in protected activity under Title VII or the DCHRA prior to the complained-of adverse actions, the Court will dismiss Counts I and X.

### B.     The ADA retaliation claim fails because plaintiff failed to allege that she engaged in activity protected by the statute.

The Americans with Disabilities Act makes it unlawful to discriminate against an employee on the basis of disability, 2 U.S.C. § 1311(a), or to retaliate for undertaking activity protected by the statute.  *See id.* § 1317(a).  Count VII alleges that defendant retaliated against plaintiff because she is hard-of-hearing.  She asserts that she "made repeated complaints to HR, the Chief of Staff,

the Assistant Dean, OMBUDS, and Associate Provost from November 2017 until her termination in reference to the harassment and hostile work environment she endured," and that she "filed a Charge of Discrimination with the [EEOC] on June 27, 2019 asserting Defendant retaliated against Plaintiff on the basis of her disability (deafness)."  Compl. ¶ 144–45.

But as was the case with the race discrimination claims, while there are allegations that plaintiff complained about how she was being treated, there is no allegation, and no document submitted as part of the record, showing that plaintiff engaged in the specific activity protected by the ADA and complained that she was being discriminated against *because of her disability*. *Broderick,* 437 F.3d at 1232; *see* Compl. ¶¶ 27–28, 42, 45, 52; *see also* Feb. 28, 2018 Letter. Because the EEOC complaint that did lodge that charge was brought months after her termination, it cannot serve as the basis for her retaliation claims.  *See Cones*, 199 F.3d at 521.

Since plaintiff has not alleged facts to show that any of the alleged adverse actions were taken after she engaged in protected activity under the ADA, Count VII will be dismissed.

### C.    The FMLA retaliation claim fails because she fails to allege causation between taking leave under the FMLA and her termination, and the harassment she points to in support of this claim does not rise to the level of an adverse action.

The Family Medical Leave Act of 1993 entitles eligible employees to take unpaid leave for family and medical reasons.  29 U.S.C. § 2601, *et seq.*  Count VIII alleges that plaintiff exercised her rights under the statute when she took medical leave from January 23 to March 18, 2018 and that defendant retaliated against her for doing so.  Compl. ¶¶ 154–61.  Count VIII enumerates the following actions alleged to be retaliatory:   1) the January 22, 2018 reprimand concerning plaintiff's use of sick leave and the requirement that she provide a doctor's note any time she took sick leave, *Id.* ¶¶ 162, 37; 2) harassment and reprimands from O'Brien after plaintiff returned from FMLA leave, *id.* ¶¶ 156–58 (describing her supervisor's flicking the door lights, making large

gestures, smirking, and walking away "[p]ost FMLA leave," the April 5, 2018 meeting in which plaintiff "expressed a lack of support for taking sick leave compared to her colleagues and the discomfort she felt around O'Brien," and Schroeder's pacing her office and staring at her "several times a day" in the month of June); and 3) the October 2018 termination, *id.* ¶ 160.

Here too, plaintiff has problems connecting the alleged retaliatory activity to protected activity.  The complaint alleges that the supervisor reprimanded her for her use of sick leave and imposed a requirement that she provide "documentation for future sick leave" on January 22, 2018. Compl. ¶¶ 30–32, 37–39, 162.  According to the complaint, "[f]ollowing the three reprimands in one week," plaintiff met with her doctor on January 23, 2018 and was granted FMLA leave from that day through March 18, 2018.  *Id.* ¶¶ 43–44.  Thus, the repeated reprimands and documentation requirement were imposed *before* plaintiff took FMLA leave, so no matter how problematical they may have been, the complaint does not state a claim that they were imposed in retaliation for taking that leave.  *Cones*, 199 F.3d at 521.[6]

---

[6]     Under the Circuit precedent this Court is bound to apply, it is also questionable whether the allegations satisfy the requirement of an actionable adverse event.  *See Baloch*, 550 F.3d at 1198 (ruling that the imposition of "sick leave restrictions – requiring that a physician certify the problem and date of treatment each time [the plaintiff] submitted a leave request" did not amount to a materially adverse action for purposes of a retaliation claim when the leave requests were always granted); *see also Kasper v. Cty. of Bucks*, 514 F. App'x 210, 216–17 (3d Cir. 2013) (ruling that the district court properly determined that employer's requirement for the plaintiff doctor's notes "was far from onerous and as such is best classified among the 'minor annoyances' of office life"), quoting *Burlington N.*, 548 U.S. at 68; *Cole v. Powell*, 605 F. Supp. 2d 20, 26 (D.D.C. 2009) ("[A] required doctor's note in the event of an unscheduled absence [is a] condition[] of employment known to workers everywhere; to impose [it] on the plaintiff does not constitute a materially adverse action.").  The successive reprimands are a closer call, but as noted above, they were issued *before* plaintiff took FMLA leave and did not objectively alter material aspects of her employment in any event.  *Burlington N.,* 548 U.S. at 68.

But plaintiff was terminated after she took her FMLA leave, and termination is an adverse employment action, so the question becomes whether the complaint alleges any facts that support a plausible inference that there was some causal connection between plaintiff's exercise of her right to take medical leave and her termination.  And here, there is nothing in the complaint beyond the conclusory allegation that "[d]efendant took the aforementioned adverse job actions against plaintiff because she exercised her lawful rights under the FMLA."  Compl. ¶¶ 160–61.

Temporal proximity between exercising one's statutory rights and an adverse action can be a relevant factor in determining a causal connection between the two, but the Supreme Court has emphasized that proximity between the protected activity and the adverse employment action must be "very close."  *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001); *Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020), *cert. denied*, 141 S. Ct. 560 (2020) ("This court, too, has often analyzed temporal proximity in terms of months – not years."), citing *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 69 (D.C. Cir. 2015) (five months); *Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012) (three months); *Mitchell v. Baldrige*, 759 F.2d 80, 86–87 (D.C. Cir. 1985) (four months); *see also Alford v. Providence Hosp.*, 561 F. App'x 13, 15 (D.C. Cir. 2014) (ruling that plaintiff's termination, which occurred more than eight months after she returned to work after taking protected leave, "foreclose[d] any plausible inference of retaliation based on temporal proximity"); *Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 109 (D.D.C. 2016) ("temporal proximity can indeed support an inference of causation" of retaliation in an FMLA claim, at least "where the two events are 'very close' in time."), quoting *Woodruff*, 482 F.3d at 529 (internal alteration and citation omitted).  But that is absent in this case as well.  Plaintiff took FLMA leave from January 23, 2018 to March 18, 2018, and she was terminated six and a half months later.  Compl. ¶¶ 44-46, 59.

Finally, plaintiff points to harassment she faced from O'Brien and others – flicking lights, making large gestures, smirking, jumping, pacing, and staring – as retaliatory actions.  Compl. ¶¶ 156–58.  But assuming these actions occurred "very close" in time to plaintiff's return from FMLA leave, they do not rise to the level of objectively tangible harm required to allege an adverse action in a retaliation claim.  *Wiley*, 511 F.3d at 161; *see Forkkio*, 306 F.3d at 1130–31.  Although plaintiff understandably found them to be annoying and harassing, they did not affect her employment or her responsibilities or benefits in any way.[7]

Since the complaint sets forth no facts that would tie the only adverse action alleged – plaintiff's termination – to her medical leave and the more than six month gap between the two events is too attenuated to give rise to an inference of causation, plaintiff fails to state a retaliation claim under the FMLA and the Court will dismiss Count VIII.

### III.    Counts IV and IX asserting race discrimination and Count III asserting wrongful termination based on plaintiff's race each fail to state a claim.

#### A.    To the extent plaintiff's race discrimination claims in Counts IV and IX rely on alleged harassment, they will be dismissed for failing to plead adverse actions.

Plaintiff alleges unlawful racial discrimination in violation of Title VII (Count IV) and the DCHRA (Count IX).  Compl. ¶¶ 99–111, 167–176.  Both Title VII and the DCHRA make it

---

[7]    The complaint also alleges that "[w]hile Plaintiff was on FMLA leave, Defendant posted an 'Extended Temporary Full-Time' Academic Advising position online."  Compl. ¶ 155.  Plaintiff argues that this action "would likely dissuade a reasonable worker from taking FMLA leave . . . for fear of job security."  Pl.'s Opp. at 18.  But granting plaintiff "the benefit of all inferences that can be derived from" the allegation, *Sparrow*, 216 F.3d at 1113, the most the Court can infer is that defendant sought to hire someone *temporarily* to handle her job responsibilities while she was on leave, which would not qualify as an adverse action even under the retaliation standard.  There is no allegation that defendant took action to replace plaintiff, and plaintiff returned to her position at the end of her FMLA leave, as required by the statute.  *See* 29 U.S.C. § 2614(a)(1)(A).

unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's race.  42 U.S.C. § 2000e-2(a)(1); *accord* D.C. Code § 2-1402.11(a)(1); see *Mawakana v. Bd. of Trs. of Univ. of D.C.*, 926 F.3d 859, 863 (D.C. Cir. 2019) ("An employee who has suffered an adverse employment action because of his race has been subjected to a violation of both statutes."), citing  *Baloch*, 550 F.3d at 1196 and *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 802–03 (D.C. 2003).

The "two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race."  926 F.3d at 866, quoting *Baloch*, 550 F.3d at 1196.  A complaint need only present "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002), quoting Fed. R. Civ. P. 8(a)(2) (ruling that pleading the elements of a prima facie case of discrimination is not required).  While the D.C. Circuit explained in *Sparrow* that the pleading standard for a race discrimination claim is a low bar to overcome, *see Sparrow*, 216 F.3d at 1115, quoting *Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir. 1998) ("'I was turned down for a job because of my race' is all a complaint has to say[.]'"), *Sparrow* was expressly based on the pleading standard set forth *Conley v. Gibson*, 355 U.S. 41 (1957), which the Supreme Court subsequently abrogated.  *See Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678.  Thereafter, in *Brown v. Sessoms*, 774 F.3d 1016, 1020 (D.C. Cir. 2014), the D.C. Circuit applied the *Twombly-Iqbal* standard to a Title VII sex discrimination case, stating that a "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *See also Greer v. Bd. of Trs. of Univ. of D.C.*, 113 F.Supp.3d 297, 310 (D.D.C. 2015) (noting that "*Twombly* and *Iqbal* require more factual context" than the "multiple assumptions" necessary to state a claim under the

*Sparrow* standard); *Easaw v. Newport*, 253 F. Supp. 3d 22, 32 (2017) (finding a complaint's conclusory allegation that the defendants "engaged in unlawful discrimination against Plaintiff based on race" was inadequate to survive a motion to dismiss under *Twombly*).[8]

Here plaintiff's claims fail with respect to both necessary elements. In the context of a discrimination claim, an adverse action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009), quoting *Taylor v. Small,* 350 F.3d 1286, 1293 (D.C. Cir. 2003); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998); *cf. Steele v. Schafer*, 535 F.3d 689, 695–96 (D.C. Cir. 2008) (establishing the lower standard for showing an adverse action in a retaliation claim). An employee must "experience[ ] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Douglas,* 559 F.3d at 552, quoting *Forkkio,* 306 F.3d at 1131; *see also Holcomb v. Powell,* 433 F.3d 889, 902 (D.C. Cir. 2006) (distinguishing between "purely subjective injuries" which are not actionable, and "objectively tangible harm," which is). In most cases, a "tangible" employment action "inflicts *direct* economic harm." 559 F.3d at 552, quoting *Ellerth*, 524 U.S. at 762 (emphasis added).

---

8       A number of courts in this district have held that *Sparrow* has been abrogated by *Iqbal* and *Twombly. See Easaw*, 253 F. Supp. 3d at 29 n.4 ("[T]he undersigned joins the chorus of Judges of this Court who have held that *Sparrow* is no longer binding authority after *Twombly* and *Iqbal*."); *McManus v. Kelly*, 246 F. Supp. 3d 103, 111 (D.D.C. 2017) ("[A]lthough the issue is not entirely settled, the Court is convinced that the *Sparrow* pleading standard is no longer controlling."); *Jackson v. Acedo*, Civil No. 08-1941 (RBW), 2009 WL 2619446, at *4 (D.D.C. Aug. 26, 2009) ("The Court . . . concludes that *Sparrow* is no longer binding authority in light of these observations by the Supreme Court in *Twombly* . . . .").

Plaintiff reiterates the various instances of harassment on the part of her supervisor to support her race discrimination claims, and she asserts that similarly-situated non-Latina employees did not have to endure the same treatment.  *See* Compl. ¶¶ 102, 105–06 (Title VII - Count IV) (claiming termination, "repeated reprimands, harassment, micromanagement and intimidation"); *id.* ¶¶ 171–74 (DCHRA - Count IX) (claiming "harassment and intimidation and . . . terminate[ion]").  But there are no facts set forth in the complaint that would support a plausible inference that these alleged events – receiving "red-flagged" advisees when she arrived in the department, having some requests to attend non-departmental events denied, receiving a "needs improvement" in one aspect of one performance review, being reprimanded, micromanaged, singled out for morning greetings by her supervisor, and stared at by an associate dean –  resulted in a significant change in plaintiff's employment status or inflicted any direct economic harm.  *See Douglas*, 559 F.3d at 552 (explaining that because the results of performance evaluations or formal criticism are speculative, they do not qualify as adverse actions, while a benefit such as a bonus or a pay raise is objectively tangible because it has a direct, measurable, immediate effect on an employee's pay).  For this reason, the Court will dismiss Counts IV and IX to the extent that plaintiff's race discrimination claims are predicated on any events other than her termination.

    **B.**    **The race discrimination claims in Counts IV and IX and the wrongful termination claim in Count III will be dismissed because plaintiff fails to allege any facts that raise the inference that she was terminated because of her race.**

Termination is an adverse employment action, and Counts IV, IX, and III assert that plaintiff was terminated because of her race.  Compl. ¶¶ 91, 94, 102, 105–06, 171–74. So the question for the Court is whether plaintiff has pled sufficient facts to give rise to a reasonable inference that she was terminated because of her race.  *See Baloch*, 550 F.3d at 1196–97.  The Court finds that plaintiff has not.

The complaint says little about race beyond the introductory assertion that plaintiff was the only Latina advisor in the department.   Compl. ¶ 13; *see also id.* ¶ 174 (same) (Count XI). Count III summarily alleges plaintiff was wrongfully terminated "because of her race."   Compl. ¶ 94.   And the assertion in Count IV that "upon information and belief, similarly-situated non-Latina employees" were treated more favorably and not subject to termination, *id.* ¶¶ 105–06, is equally entirely conclusory:   she does not identify even one non-Latina employee who was supposedly similarly situated or explain in what way she was similar.[9]   In *Brown v. Sessoms*, the D.C. Circuit reversed the dismissal of a sex discrimination claim when the complaint identified a specific similarly-situated employee who was not in plaintiff's protected class but was promoted even though the two comparators had equivalent qualifications.   774 F.3d at 1023 (finding the allegations that both employees "had similar records with regard to teaching and service" and "both also failed to meet the publication requirement" allowed the Court to draw the reasonable inference that the defendant was liable for the misconduct alleged).   There is are no analogous allegations here – there is no specificity whatsoever.

Thus, the Court is compelled to conclude that the instant complaint fails to meet the relatively modest requirements of *Iqbal* and *Twombly*:   even if one takes every word of the pleading as true, there is nothing there that would support a plausible inference that she was the victim of discrimination based on her race.   There is no statement quoted that mentioned her race directly, and there is nothing that could even be generously interpreted as a veiled reference to her status as

---

9      Plaintiff emphasizes repeatedly that defendant terminated her because she declined the proposed separation agreement, and that she never agreed to resign or terminate her employment by declining the proposal.  *See id.* ¶¶ 55–59, 89–92, 171–72.  But it is unclear what bearing this has on plaintiff's claims of race discrimination.

Latina.  Because plaintiff has not pled sufficient facts to "nudge" her claim for race discrimination and wrongful termination "across the line from conceivable to plausible,"  *Twombly*, 550 U.S. at 570, the Court will dismiss Counts IV and IX, as well as the wrongful termination claim in Count III.

**IV.**  **Count V claiming disability discrimination under the ADA will be dismissed because the complaint alleges no facts suggesting that plaintiff's termination was based in any way on her disability.**

Count V asserts that defendant terminated plaintiff because of her disability in violation of the ADA.  She states that she is the only hard-of-hearing advisor working in a department where the other advisors and her supervisor were medically deaf, Compl. ¶¶ 13–15, 112–125, and she explains that the differences in her auditory capacity and her ability to articulate enabled her to participate in conferences with hearing individuals using an assistive device, such as a hearing aid, without the need for an interpreter.  *Id.* ¶ 13.

To state a claim for discrimination under the ADA, plaintiff must allege that she has a disability within the meaning of the statute, is "qualified" for the position with or without a reasonable accommodation, and that she suffered an adverse employment action because of this disability.  *Swanks v. WMATA,* 179 F.3d 929, 933–34 (D.C. Cir. 1999).  "Putting aside the issue of reasonable accommodation, the two basic elements of a disability discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's disability."  *Adeyemi v. District of Columbia,* 525 F.3d 1222, 1226 (D.C. Cir. 2008).

There is no dispute that the termination would constitute an adverse action, or that in an ordinary case, being either medically deaf or hard-of-hearing would constitute a disability cognizable under the ADA.  *See* 42 U.S.C. §§ 12102(1)(A) & (2)(A) (defining "disability" under the ADA as "a physical or mental impairment that substantially limits one or more major life

activities of [an] individual" and "major life activities" to include hearing); *see, e.g., Ball v. AMC Ent., Inc.*, 246 F. Supp. 2d 17, 20 (D.D.C. 2003) (describing deaf plaintiffs has having "a disability recognized by the ADA"). Here, though, plaintiff is alleging that she was discriminated against not because of what she was unable to do, but because she had abilities that others lacked, and she was *not* medically deaf.

The Court need not address the theoretical question of whether those facts, if shown, could be the basis for a discrimination claim under ADA. The question raised in the motion to dismiss is whether plaintiff has alleged sufficient facts to support a plausible claim that she was in fact terminated for the alleged reason, putting aside whether it would be cognizable under the ADA.

Here, too, the complaint is entirely conclusory. Plaintiff alleges that she is hard-of-hearing while her colleagues were deaf. *Id.* ¶¶ 13–15, 116–17. And she concludes Count V with the assertion that her deaf colleagues "were not subjected to the same or similar discriminatory treatment that Plaintiff endured, including . . . termination" and that her differences motivated defendant's actions against her. *Id.* ¶¶ 117–20. But she alleges no facts that could show, directly or indirectly, that her supervisor or the school harbored any bias against her for that reason, or that could give rise to a plausible inference that her abilities played a role in her termination.

Therefore, the Court will therefore dismiss Count V.

**V.   Because all of the federal claims will be dismissed, the Court declines to exercise jurisdiction over the Count XII claim of interference in violation the D.C. Accrued Safe and Sick Leave Act.**

Given the decisions set forth above, all of the federal claims will be dismissed, leaving only one state claim left standing: Count XII, alleging that the university interfered with plaintiff's rights under the D.C. Accrued Safe and Sick Leave Act. Under those circumstances, the Court will decline to exercise supplemental jurisdiction over the lone state law claim.

A district court "may decline to exercise supplemental jurisdiction over a claim" when the court "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c), a decision that is "left to the discretion of the district court" and reviewed for "abuse of discretion." *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1266–67 (D.C. Cir. 1995). "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Anderson v. Holder*, 647 F.3d 1165, 1174 (D.C. Cir. 2011), quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, (1988); *see also Edmondson*, 48 F.3d at 1266–67 (holding that the principles of "comity and fairness point[ed] strongly towards having the District of Columbia's courts decide the [local] claims," and that the district court abused its discretion by exercising supplemental jurisdiction over the local law claims after it had dismissed the federal RICO claims).

The Court will decline to exercise jurisdiction over Count XII.

## CONCLUSION

For the foregoing reasons, [Dkt. # 3] defendant's motion to dismiss will be GRANTED as to Counts I through XI and the Court will decline to consider Count XII.

A separate order will follow.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 27, 2021